### In re MARDENFELD.

(District Court, N. D. New York. March 26, 1919.)

BANKRUPTCY ☞136(1)—CONTEMPT OF BANKRUPT—USE OF PROPERTY AFTER PETITION FILED.

Bankrupt, who, knowing he was bankrupt, after petition was filed against him, amounting to an attachment and injunction, and after custodian of his property was appointed, to his knowledge and with his consent, used money, which he did not disclose, for living expenses of himself and family and in paying claims against himself, before the delayed adjudication, and appointment of a trustee, and then shows his inability to return it or restore the amount, his whole conduct showing a purpose to defraud his creditors and impose on the officers of the court, may be punished for contempt.

In Bankruptcy. In the matter of Louis Mardenfeld, an individual, trading as Mardenfeld & Grossman, bankrupt. Findings and recommendations of referee approved and confirmed.

Motion to confirm the report of Hon. James A. Van Voast, as special master, and return of order to show cause why the above-named bankrupt, Louis

Mardenfeld, should not be punished for contempt for neglecting and failing on demand to pay over to Thomas R. Tillott, trustee in the above-entitled matter, the sum of $1,328.13, money of the bankrupt in his hands on the day the petition in bankruptcy was filed, and which sum he proceeded to spend in paying certain claims, paying his attorney and in the support of himself and his family. The question now before the court is whether or not such report should be approved and confirmed, and an order made punishing the bankrupt.

Del B. Salmon, of Schenectady, N. Y., for trustee.

Harry G. Coplon, of Schenectady, N. Y., for bankrupt.

RAY, District Judge (after stating the facts as above). The facts in this case are not involved. A short time before the involuntary petition in bankruptcy was filed the now bankrupt had a fire in his store at Gloversville, N. Y., and there came due him from the insurance company for loss on account thereof over $3,600. He was also running a store in Schenectady, N. Y., in which he had a small stock of goods, worth $1,400. It would seem he was having some talk with certain of his creditors as to a composition, as he had had communication with a lawyer in New York City named David Geiger, who represented some of his creditors. On the 20th day of December, 1918, a draft payable to said now bankrupt came into his possession for the sum of $1,328.13 in part payment for such fire loss. The now bankrupt had employed one Harry G. Coplon of Schenectady, N. Y., as his attorney in said matter, and all three knew that bankruptcy proceedings were contemplated and threatened.

On the morning of December 21, 1918, Geiger in person appeared at Utica, about 250 miles from New York City, and filed with the clerk of this court an involuntary petition in bankruptcy against Mardenfeld, and then on the same day went to Schenectady and saw Coplon and informed him of the filing of such petition. Although Coplon, attorney for said Mardenfeld, saw him the same day or the next day, he insists in open court that he did not inform Mardenfeld of the filing of such petition. If he did not, he failed in his duty to his client and to the court. The statement is not credible. Geiger did nothing further after seeing Coplon, and service of the subpœna was not made on the alleged bankrupt until December 23, 1918, although his whereabouts were well known.

On the motion to confirm, and on the return of the order to show cause, the bankrupt, later adjudicated such, files an answer, in which he admits the receipt of the draft for $1,328.13 on the 20th day of December, 1918, and says:

"The respondent herein, at the time said draft was received by him, did not know that an involuntary petition in bankruptcy was to be filed against him on the 21st day of December, 1918."

He does not say when he heard one had been filed. He also says in his answer he was not requested by any one, or notified, that he should turn over the draft or its proceeds until February 3, 1919. He also states that from December 21, 1918, until February 3, 1919, he was endeavoring to secure a composition settlement with his creditors, and that he believed such a settlement would go through, and that for

that reason he used the said moneys, proceeds of such draft, in the manner stated, including the necessary support of himself and family. He says he expended the money as follows:

| | |
|---|---|
| Paid Harry G. Coplon, attorney.................................... | $ 500 00 |
| Paid his wife $240, that is, $40 per week for six weeks; back rent $74, and rent $48, for January and February, 1919.............. | 362 00 |
| Paid two creditors on account.................................... | 125 00 |
| Paid insurance company to prevent lapse of policy................ | 43 28 |
| Paid expenses to New York City with Coplon, his attorney, December 24, 1918, $75, and January 2, 1919, $50, and expenses, board, etc., at hotel in New York $120................................ | 245 00 |
| Paid for overcoat $30, and for suit of clothes $20................ | 50 00 |
| Making in all........................................ | $1,325 28 |

He says his wife and child were sick a portion of the time during which he was paying the wife $40 per week from this money. There is no pretense the bankrupt and his attorney, or either of them, went to the referee or to the court and suggested a composition, or proceedings to secure one, or that any such proceeding was instituted.

Coplon makes affidavit that December 17, 1918, he was called on the telephone by the now bankrupt from New York City to go there on important business, and that he did go, and that he and the now bankrupt saw David Geiger the next day, and that Geiger then insisted on involuntary petition in bankruptcy would be filed; that he interviewed certain creditors to induce them to grant Mardenfeld an extension of time, and spent the days from December 18th to December 20th in such efforts; that he could not secure a meeting of creditors, and that he paid his own expenses, which were $54. Coplon then says the involuntary petition was filed, and that thereafter he wrote letters calling a meeting of creditors, and went to New York December 23, 1918, and met creditors and offered a composition of 10 per cent. cash and 15 per cent. indorsed notes, and the creditors present expressed a willingness to accept, but no papers were signed. He says he left the bankrupt in New York to secure consents; that January 3, 1919, he went again to New York for the same purpose; also that he went again on January 30, 1919, and returned "to Schenectady on the 3d day of February, 1919, in time to attend the sale of the bankrupt stock of the bankrupt Mardenfeld," and that an examination of the bankrupt was held February 3, 1919.

In point of fact, Geiger and Coplon voluntarily appeared before the referee December 21, 1918, at Schenectady, N. Y., and asked that a custodian of the property of Mardenfeld be appointed, and one was appointed by the referee on Monday, December 23, 1918, when the bankrupt, Mardenfeld, was also present and was examined by the referee on the question of a custodian, and at which time he testified as follows:

"Q. Are you one of the partners of the firm of Mardenfeld & Grossman? A. Yes, sir.

"Q. It is a copartnership, and not a corporation, is it not? A. Copartnership. Mr. Grossman's first name is Max; he is in the United States service, and not in actual charge of the business.

"Q. You have two stores, have you not? A. Yes, sir.

"Q. Where is the one in Schenectady? A. 203 State street.

"Q. Where is the other store? A. 10 South Main street, Gloversville.

"Q. What is the nature of the business? A. Ladies' and children's ready-made clothing. * * *

"Q. As you understand, a petition in bankruptcy was filed against you last Saturday morning? A. I do.

"Q. It was an involuntary petition; have the papers been served upon you yet? A. No."

After having heard Geiger and Coplon on Saturday, December 21st, and Coplon and the bankrupt on Monday December 23d, the referee made the following order:

"Ordered, that until the further order of the court William M. Miller be, and he hereby is, appointed as a person to take possession and charge of the merchandise, stock, and fixtures contained in the two above-mentioned stores of the alleged bankrupts, and to continue the business now being carried on by them in said stores, not, however, to purchase any new stock of goods or merchandise, nor to incur any expense beyond the necessary expense for the continuation of the business, including clerk hire, lighting, and rent."

No mention was made to the referee of any money or drafts in hand or coming to the bankrupt. The referee was in ignorance of this money received and coming to the estate. He acted with reference to the property in the two stores, and supposed this was all the property the bankrupt firm had. He was not advised that Grossman was out of the firm, but, on the other hand, was given to understand that he was still a member of the firm and in Europe. Neither Coplon nor the bankrupt disclosed the fact of the receipt by Mardenfeld of such draft, or of the money thereon, or that such money had been received, or was coming to the alleged bankrupt. This was a concealment from the referee and creditors of an important fact. It was only on the examination of the bankrupt February 3, 1919, that creditors, except one or two, or the referee, obtained knowledge that Mardenfeld had received this money, or that any such sum was due him. Neither Coplon nor Geiger did anything to prosecute or aid and expedite the bankruptcy proceedings, or in the interest of creditors, after the filing of the petition. At the date of this hearing March 18th the bankrupt had not made or filed his schedules. It is evident from all the papers and proceedings that the creditors and referee would have remained in ignorance to this day of the existence of such money received by the bankrupt as stated, had not other creditors come in and procured an examination of the bankrupt.

Coplon has not earned the $500 by any services rendered the bankrupt for which an allowance can be made, or ought to be made, out of the estate, and it is the duty of the trustee to recover same, less such sum as ought to be allowed as a reasonable attorney's fee under section 64 of the Bankruptcy Act.

Demand has been made on the bankrupt for this money. He has neglected and refused to pay it over. In answer to these proceedings he boldly and defiantly alleges its receipt, and asserts its expenditure for the purposes stated, under the circumstances stated, all after the petition was filed. That while he was spending this money the bankrupt knew proceedings in bankruptcy were pending against him is beyond all question.

Is there any remedy? Can this bankrupt be punished for contempt in not paying over this money, or for dissipating it and depriving the estate of same? It may be true that he has spent the most of it, if not all. When an alleged bankrupt, who is in fact bankrupt, and he is conscious of the fact, after a petition has been filed against him, deliberately appropriates the money belonging to the bankrupt estate to his own use, spends it in living expenses for himself and family, and in the purchase of clothing for himself, and in payments on claims against himself, debts owing by him, and then shows his financial inability to return it, or restore the amount, can anything be done by way of punishment for contempt? If not, what remedy do creditors have? If not, how can the court protect the estate and save the rights of creditors? Is the court in such a case impotent and helpless?

This is a peculiarly aggravated case, as it is apparent that Coplon and Geiger were allied and acting in concert to delay action, if not to defeat the Bankruptcy Act. Geiger and Coplon were in close communication prior to the filing of the petition. Geiger filed the petition the day after the bankrupt received this money, and went immediately and saw Coplon, and they had a custodian appointed, but took no further action. He, as attorney for the petitioning creditors, did nothing further. He neither saw nor voluntarily thereafter communicated with the referee or the court. Coplon gets $500 of the money, three creditors a part thereof, and the bankrupt, he says, proceeded to spend the remainder as stated. Coplon and Geiger, both lawyers, knew that under section 70 of the Bankruptcy Act the title would vest in the trustee as of the date Mardenfeld was adjudged a bankrupt, and hence it was important to the bankrupt to delay adjudication, and hence nothing further was done. Mardenfeld's attorney places perfect reliance on the decisions that contempt orders cannot be made and enforced against a bankrupt for nonpayment of money when he shows he is unable to comply with the order, and cites them to the court as a complete answer to this application. By delaying the adjudication, both Coplon and Geiger knew the bankrupt would be enabled to spend the money before that event, and either knew, or supposed they knew, the trustee would be powerless to obtain restitution.

In this case the matter was so cunningly managed that the bankrupt had actually spent all the money, accepting his statement, before a trustee was appointed, and hence there has been no concealment of property from his trustee while a bankrupt in violation of section 29 of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 554 [Comp. St. § 9613]). But the bankrupt, knowing that a petition had been filed against himself, and having this money belonging to his estate in bankruptcy in his possession, and knowing it was his duty to keep it and turn it over to his trustee in bankruptcy, when appointed, for the benefit of his creditors, paid $500 to his lawyer, $240 to his wife to pay living expenses, $74 on a debt he owed for rent, $48 for rent for January and February, 1919, $125 to two of his creditors on account of their claims, $50 for clothing for himself, and $245 for his own living and hotel expenses in New York and perhaps other places, and when he did this he knew he was unable to make it good.

There is a line of decisions which makes these acts a criminal contempt and punishable, regardless of the present ability of the bankrupt to pay over the money. Matter of Adam Ferris et al., trading as the Paris Mfg. Co., 33 Am. Bankr. Rep. 565, 566, 567; Clay v. Waters, 178 Fed. 385, 101 C. C. A. 645, 21 Ann. Cas. 897 (C. C. A., 8th Circuit); In re Potteiger (D. C.) 181 Fed. 640, 24 Am. Bankr. Rep. 648; Merrimack River Sav. Bank v. City of Clay Center, 219 U. S. 527, 535, 31 Sup. Ct. 295, 55 L. Ed. 320; Wartman v. Wartman, 29 Fed. Cas. 303; Ex parte Calvin W. Kellogg, 64 Cal. 343, 30 Pac. 1030, cited and approved 219 U. S. page 536, 31 Sup. Ct. 295, 55 L. Ed. 320; Matter of Lutfy (D. C.) 156 Fed. 873, 19 Am. Bankr. Rep. 614; United States v. Shipp, 203 U. S. 563, 574, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265; Collier on Bankruptcy (11th Ed.) page 63. In this case, as the bankrupt knew of the proceedings, it is immaterial that the subpœna was not served on him until December 23d. His attorney in the matter was notified of the filing of the petition almost immediately by the lawyer who filed it, and almost immediately the bankrupt's attorney obtained $500 of the money, and the attorney who filed the petition remained quiescent.

In Matter of Paris Mfg. Co., supra, the court held:

"A member of a bankrupt partnership, who, after the filing of the petition in bankruptcy and the service of process upon the bankrupts, paid money belonging to the firm to his brothers-in-law in satisfaction of alleged personal debts, is guilty of criminal contempt and properly imprisoned therefor."

And the court said:

"The referee has carefully considered the facts of this case, and he can find in it no extenuating circumstances as regards the respondent Harry Siegel. It is contended that the debts alleged to be due to the respondents Hyman Weisser and Alter Weisser were valid ones, and that the respondent Harry Siegel ought not to be punished as for a contempt in paying such debts; but it is manifest that, even if it be assumed that these debts were valid, the respondent Harry Siegel could not, under the circumstances, pay the debts without violating the mandate of the court, and that, if a court of bankruptcy should give its sanction to the course here followed, it would open the way to an easy method by which in all cases bankrupts could withdraw their property from the jurisdiction of the court of bankruptcy and thereby defeat its decree. It is further urged that the petitioning creditors should have protected themselves from the wrongful transfer of the bankrupt's property by securing a seizure of the property through the marshal or a receiver. But certainly it is not open to the bankrupts to urge such a defense, and, furthermore, the mere possession of property by a bankrupt presents no grounds for seizure, as the law casts upon the bankrupt the duty of preserving the property for administration in bankruptcy, and creditors are entitled to assume that he will obey the law and the mandate of the court, and not disregard both, as was done in this case. It is also urged in extenuation that the respondent Harry Siegel is an ignorant man, and did not know that his acts were contrary to law; but the testimony given by this respondent, together with the facts in evidence, show very plainly that he is a shrewd, cunning, and resourceful man, and there is no doubt in the mind of the referee that he deliberately planned and executed a scheme to circumvent the creditors of the bankrupt firm and to defeat and render ineffective the process of this court. To give countenance or sanction to the acts of this respondent would be to invite cunning and unscrupulous persons to disregard the law and to treat with contempt the process of the court, and would be fraught with most disastrous consequences. As the gravamen of the offense here committed consists of unlawfully disposing of the bankrupts' property

after notice of the pendency of the bankruptcy proceeding, and as the evidence does not indubitably establish that the respondents Hyman Weisser and Alter Weisser knew that the petition had been filed, the referee is of the opinion that no action should be taken as against the respondents Hyman Weisser and Alter Weisser. But the referee is of the opinion that the facts clearly show that the respondent Harry Siegel has been guilty of a contempt of this court, and should be punished therefor in such manner as the court, in its discretion, deems appropriate."

In Clay v. Waters, supra, the court said:

"Any willful interference with any of this trust estate, any willful attempt to injure it, to withdraw it from the custody of the court, or to conceal it from the court, or any of its officers whose duty it is to administer it, is a defiance of the power and an affront to the dignity of the court, which may be punished by a judgment for contempt. In re Walsh Bros. (D. C.) 159 Fed. 560, 562; In re Lutfy (D. C.) 156 Fed. 873, 875; Wartman v. Wartman, 29 Fed. Cas. No. 17,210, pp. 303, 304, 305, 306. * * *

"A party to a suit, who knowingly and intentionally disposes of its subject-matter with intent to withdraw it from the jurisdiction of the court, and to render futile any future decree concerning it, unavoidably defies the power and affronts the dignity of the court, and thereby renders himself liable to punishment for contempt. Wartman v. Wartman, 29 Fed. Cas. No. 17,210, pp. 303, 304, 305, 306; Ex parte Kellogg, 64 Cal. 343, 344, 30 Pac. 1030; Greite v. Henricks, 71 Hun, 11, 24 N. Y. Supp. 546; In re Grant, 26 Wash. 412, 67 Pac. 73, 74; American Construction Co. v. Jacksonville, T. & K. W. Ry. Co. (C. C.) 52 Fed. 937, 941; Devlin v. Hinman, 161 N. Y. 115, 117, 55 N. E. 386; 9 Cyc. par. D, and note 22."

In Merrimack Riv. S. Bank v. Clay Center, supra, the Supreme Court held:

"Irrespective of an actual injunction order, the willful destruction or removal beyond the reach of this court of the subject-matter of litigation pending an appeal to this court is a contempt of the appellate jurisdiction of this court; and this is so, even though it may also be a violation of the injunction below."

The court cited with approval Wartman v. Wartman, supra, and said:

"In Wartman v. Wartman, cited above, a case heard by Chief Justice Taney on the circuit, the question was whether a defendant who had parted with an alleged trust fund in his custody pending an application for an order requiring him to pay the money into court was thereby in contempt. His act was held to be in contempt of the authority of the court, as a final decree would be idle and nugatory, if pending the litigation he should be held at liberty to put the fund beyond the reach of the process of the court."

In speaking of absence of an injunction the court said (219 U. S. 535, 536, 31 Sup. Ct. 296, 55 L. Ed. 320):

"This we need not decide, since irrespective of any such injunction actually issued the willful removal beyond the reach of the court of the subject-matter of the litigation or its destruction pending an appeal from a decree praying, among other things, an injunction to prevent such removal or destruction until the right shall be determined, is, in and of itself, a contempt of the appellate jurisdiction of this court. That such conduct may be a violation of the injunction below affords no reason why it is not also a contempt of this court."

In United States v. Shipp, supra, one Johnson had been convicted and sentenced to death, and was confined in jail awaiting the execution of the sentence. The Supreme Court of the United States allowed an

appeal, and ordered that all proceedings against the appellant be stayed, and that the custody of the said appellant be retained pending the appeal. It was the duty of Shipp, the sheriff, to keep the prisoner, Johnson, pending the appeal. Conniving with the sheriff, a mob broke into the jail, took Johnson out, and hung him. This, of course, made any decision the Supreme Court might make fruitless, and made it impossible to proceed with the case. It was sought to punish the sheriff for contempt. The court said:

"The question was touched, in argument, whether the acts charged constitute a contempt. We are of opinion that they do, and that their character does not depend upon a nice inquiry whether, after the order made by this court, the sheriff was to be regarded as bailee of the United States, or still held the prisoner in the name of the state alone. Either way, the order suspended further proceedings by the state against the prisoner, and required that he should be forthcoming to abide the further order of this court. It may be found that what created the mob and led to the crime was the unwillingness of its members to submit to the delay required for the trial of the appeal. From that to the intent to prevent that delay and the hearing of the appeal is a short step. If that step is taken, the contempt is proved."

There the defendants claimed and made oath that they had nothing to do with the murder of Johnson, and assumed and consented that this ended the proceedings to punish for contempt. The court said:

"Another general question is to be answered at this time. The defendants severally have denied under oath in their answer that they had anything to do with the murder. It is urged that the sworn answers are conclusive, that if they are false the parties may be prosecuted for perjury, but that in this proceeding they are to be tried, if they so elect, simply by their oaths. It has been suggested that the court is a party and therefore leaves the fact to be decided by the defendant. But this is a mere afterthought, to explain something not understood. The court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case."

In this case the bankrupt makes oath that he has paid out and spent the money and is unable to return it. Here, instead of removing a human being, the subject-matter of the litigation, from the jurisdiction of the court, and preventing the judicial action of the court respecting same, the bankrupt and his attorney removed a substantial part of the bankrupt estate from the jurisdiction of the court and placed it beyond its reach and that of trustee and creditors. There is no difference in principle. It was the duty of this bankrupt to safely keep the money and turn it over to the receiver or trustee when appointed.

The Bankruptcy Act provides for making offers of composition to creditors after the filing of a petition and before adjudication, as well as after adjudication. There is to be a meeting of creditors to consider such offers, and the bankrupt is to be examined. The court is a participant, and the bankrupt, after a petition is filed against himself, cannot dissipate the estate in personal efforts, out of court and without its knowledge, to effect a compromise with creditors, or employ an attorney for such purpose, and pay him from the money of the estate in his hands, or expect the court to pay him from the estate. In in-

voluntary proceedings, a reasonable allowance can be made the attorney for the petitioning creditors, and, as the bankrupt is required to do certain specified things, the law provides that he may have a reasonable allowance in proper cases.

The evidence taken before the referee shows that Geiger and Coplon visited the referee on December 21st, and that the next day, Sunday, Coplon got $500 of this money from Mardenfeld. The evidence shows that Coplon and Geiger, in what they did, actually misled the referee, who had no specific authority to act in the matter, as the case had not been referred to him, and quieted creditors in the vicinity of Schenectady. The referee was led to suppose that the stock of goods was all the property the alleged bankrupt possessed. H was kept in ignorance of the money due for insurance loss. Coplon knew of it, for he obtained $500 of it the same or the next day.

On his examination before the referee, February 3, 1919, the bankrupt testified that he did not know he was insolvent, and believed he was solvent all this time, even when he was negotiating with creditors for a settlement at 10 per cent. cash and 15 per cent. notes. Still he was owing over $14,000, and his only estate consisted of a stock of goods worth $1,400 and this insurance money, in hand and coming, in all not to exceed $5,000. He was offering a compromise of 10 per cent. cash and 15 per cent. notes, and believed himself solvent! His testimony is not credible, and does not appeal to this court. Taken in connection with his conduct, the court does not credit the stories told by him. The evidence shows that Mardenfeld assigned all the moneys coming on the fire loss to secure a loan (he claims) or two loans of less than $1,000, and that he spent time and money to secure the third draft coming for the balance of the insurance money out of the regular course. In short, his whole conduct shows a purpose to cheat and defraud his creditors, and impose upon the officers of this court, and place this money beyond the reach and control of the court.

It is a mistake to assume there was no injunction in this case. The filing of the petition was "a caveat to all the world, and in effect an attachment and injunction." Mueller v. Nugent, 184 U. S. 1, 14, 22 Sup. Ct. 269, 275, 46 L. Ed. 405; Bank v. Sherman, 101 U. S. 403, 25 L. Ed. 866. This is the language and holding of the Supreme Court under the present Bankruptcy Law (Mueller v. Nugent, supra), as it was under the act of 1867. It has been followed and approved many times. On Monday, December 23, 1918, the bankrupt was before the referee, and testified that the petition had been filed on the 21st, and consented to a custodian of the stock of goods, but remained silent as to the money, thereby concealing it from the referee and the court, and then he proceeded to spend the remainder in defiance of the injunction created by the filing of the petition and service of the subpœna.

It should also be noted that when Mardenfeld, with his attorney, went voluntarily before the referee on Monday, December 23d, and consented to a custodian, it was represented and stated that there was a firm or copartnership which owned this property, consisting of Mardenfeld and one Grossman. In truth, this firm or copartnership had ceased to exist. Mardenfeld had bought out Grossman, and given

his note for his interest, and Mardenfeld was continuing the business and trading under the old firm name.

The trustee will take proper proceedings to have the amount of the allowance to the attorney for the bankrupt fixed by this court and to recover the balance from Coplon. There will also be an order requiring the bankrupt to pay over to the trustee this money belonging to the estate, and which the bankrupt says he has used up as stated, and giving him 10 days in which to comply, in order to purge himself of the contempt committed. If not paid over, so as to purge him of the contempt committed by placing such money beyond the reach and jurisdiction of the court, for the purpose of defeating such jurisdiction, he will be committed to the county jail of the county of Schenectady, N. Y., for the term of six months, or the further order of this court.

The findings and recommendation of the referee are approved and confirmed.