## LINEKER et al. v. DILLON et al.

(District Court, N. D. California, Second Division. August 8, 1921.)

1. **Banks and banking ⚍112—Banks chargeable with knowledge of officers.**

   Banks accused in contempt proceedings of having conspired with judgment debtor in obstructing the enforcement of a judgment, and in aiding judgment debtor in removing her tangible property beyond the reach of process, are chargeable with the knowledge, purpose, and intent of their officers.

2. **Execution ⚍158(1)—Bank held to have intentionally aided judgment debtor in removing tangible assets beyond reach of process.**

   Evidence *held* to prove that banks and bank officers, accused in contempt proceedings of having conspired with judgment debtor in obstructing the satisfaction of the judgment, and of having aided judgment debtor in removing her tangible assets beyond the reach of process, by enabling her to sell real estate and assisting purchaser thereof without security, during stay of execution, participated in such transactions with knowledge of judgment debtor's purpose to avoid payment of judgment, and with intent to aid her to so do.

3. **Execution ⚍158(1)—Purchaser of judgment debtor's land held without sufficient knowledge of fraudulent character of transaction to be in contempt.**

   Evidence *held* insufficient to prove that purchaser of judgment debtor's real estate immediately after rendition of judgment, accused in contempt proceedings of having conspired with judgment debtor to defeat enforcement of judgment, had sufficient knowledge of the fraudulent character of the transaction to render him in contempt.

4. **Torts ⚍13—Persons who participate in judgment debtor's disposition of his property with knowledge held liable to creditor.**

   Judgment debtor's disposition of her property must be for a legitimate and valuable consideration, and not for the fraudulent purpose of evading the judgment, and if the disposition is for the purpose of defeating the judgment creditor's rights, others, who participate in the transaction with knowledge of such fraudulent purpose, are liable to the creditor for the damages caused by their interference.

5. **Execution ⚍158(1)—Granting of stay discretionary with court.**

   The granting of a stay of execution is not a matter of right, but is discretionary with the court.

6. **Execution ⚍174—Rights of parties to remain in statu quo during stay of execution.**

   During stay of execution, the rights of the parties are to remain in statu quo, and neither has the right to take any steps intended to impair the rights of the other under the judgment; such conditions being implied in the order as though expressly written therein.

7. **Execution ⚍158(1)—Aiding judgment debtor in removing property beyond reach of process during stay of execution held contempt.**

   Banks and their officers, who assisted judgment debtor in removing her tangible property beyond the reach of process pending stay of execution, *held* guilty of contempt, having violated court's order staying execution, impliedly prohibiting, during such stay, any step intended to impair the rights of the parties under the judgment.

8. **Execution ⚍158(1)—Court authorized to punish as in contempt persons who aided judgment debtor in removing property beyond reach of process during stay of execution.**

   Court having granted a stay of execution was empowered to punish as in contempt persons who, during pendency of stay, undertook to render judgment nugatory by aiding judgment debtor to remove her tangible property beyond reach of process, notwithstanding Judicial Code, § 268

---

⚍For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(Comp. St. § 1245), relating to the court's power to punish contempts, since such statute conferred no power not previously granted, and imposed no conditions not previously existing.

**9. Execution ⊕⟿158(1)—Persons who aid judgment debtor in disposing of her property, subject to judgment lien, to evade lien, held guilty of contempt.**

Banks and their officers, who aided judgment debtor in disposing of her real estate with the purpose of impairing or evading judgment lien with which the property had become impressed, *held* guilty of contempt.

**10. Judgment ⊕⟿760—Of federal court in California a lien on judgment debtor's land in a county, though transcript is not filed with recorder thereof.**

Judgment of United States District Court *held* to constitute a lien on judgment debtor's land in California from the date of its docketing, though transcript is not filed with recorder as is necessary in the case of a judgment of the state court under Code Civ. Proc. Cal. § 674, notwithstanding Comp. St. § 1606, making judgments of the United States Courts liens on property to the same extent and under the same conditions only as if such judgments had been rendered by a state court, and providing that such act should be applicable in a state wherein the laws require a judgment to be registered, etc., before a lien should attach, only whenever the laws of such state should authorize the federal judgments rendered by courts in such state to be registered, etc.; such statute being inapplicable notwithstanding Code Civ. Proc. Cal. § 671a, as added by St. 1917, p. 142, providing that a transcript of judgment of a federal court within the state may be filed and recorded with the county clerk, and, when certified by clerk, may be filed for record with the county recorder, and shall become a lien on land in the county when recorded and indexed by the recorder, since such statute does not put the federal judgments on an equality with the judgments of the state courts as contemplated by the federal act.

**11. Execution ⊕⟿158(1)—Persons in contempt for aiding judgment debtor in removing property required to pay judgment creditor amount lost.**

Persons adjudged in contempt for conspiring with judgment debtor to defeat enforcement of a judgment, and aiding debtor to remove her tangible property beyond the reach of process, will be punished by being required to make judgment creditors good in the amount they have lost through the interference of such persons, without the judgment creditors being required, after having been put to great annoyance and expense in the collection of a portion of the judgment, to go to further expense, and to be subjected to further annoyance and hazard, in attempting to reach land claimed as a homestead and setting aside judgment debtor's sales of her property.

At Law. Action by Norvena Lineker and another against Mary J. Dillon, formerly Mary J. Tynan, and Thomas B. Dillon. Judgment for plaintiffs. In the matter of the contempt of the First National Bank of Modesto and E. C. Peck, President, the Union Savings Bank of Modesto and C. D. Swan, President, and G. W. O'Connor. Proceeding dismissed as to G. W. O'Connor. Respondents other than O'Connor adjudged in contempt.

John L. Taugher, of San Francisco, Cal., for plaintiffs.

John S. Partridge, of San Francisco, Cal., for respondent O'Connor.

Heller, Powers & Ehrman, of San Francisco, Cal., for respondents First Nat. Bank of Modesto, E. C. Peck, Union Sav. Bank of Modesto, and C. D. Swan.

⊕⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

VAN FLEET, District Judge. This is a proceeding in contempt of a civil and remedial nature arising in the above-entitled cause, based upon a sworn petition by the plaintiffs, wherein the respondents named therein, the First National Bank of Modesto and E. C. Peck, its president, the Union Savings Bank of Modesto and C. D. Swan, its president, and one G. W. O'Connor, are charged with having conspired and confederated with the defendants in the action to obstruct and defeat the enforcement and satisfaction of a judgment recovered therein by the plaintiffs and to render the same nugatory and fruitless by doing certain acts and things in aid of such conspiracy and to accomplish its purpose. The facts upon which the charge rests, as disclosed by the evidence, are in substance these:

The judgment in question was recovered on October 3, 1919, for $32,000 and costs, and on the same date duly entered and docketed, but on which execution was, at the request of the defendants, stayed for a period of 30 days. While the judgment ran against both defendants, the cause of action arose upon certain tortious acts of the defendant Mary J. Dillon, committed prior to her marriage to the defendant Thomas B. (the latter being joined in the action under the state statute) and the judgment was accordingly directed to be satisfied out of the property of the former. At the time of the rendition of the judgment the defendants resided in the town of Modesto, Stanislaus county, and the defendant Mary J. Dillon was possessed in her own right of a large amount of property in that county. She had between $7,000 and $8,000 in cash in the respondent First National Bank, and in addition thereto was the owner of real and personal property of the value of upwards of $35,000, consisting of a home in the town of Modesto of a value in excess of $7,500, a ranch or farm outside the town of the value of $25,000, and a note secured by a trust deed of certain real estate in the county, on which there was due her something over $8,200, principal and interest. This constituted, so far as shown, all the property she owned.

Immediately upon the rendition of the judgment and the order staying execution, the defendants returned to their home in Modesto, and Mrs. Dillon at once set about "covering up" her property from seizure under execution by putting it in a form that it could not readily be found or taken for that purpose. Her husband filed a claim of homestead on her residence in Modesto, and her other tangible property was precipitately and expeditiously sold and turned into ready money at a very considerable sacrifice. To thus dispose of her property she enlisted the aid of the two respondent banks, of which she was an old patron, and the advice and assistance of their respective presidents, the respondents Peck and Swan, with whom she was on familiar terms of business dealing. These latter procured her a purchaser for her ranch or farm in the person of the respondent O'Connor, a local land agent and speculator, who had had more or less frequent and intimate dealings with the two banks and their presidents, and to whom the respondent First National Bank advanced and loaned, without any collateral security, the necessary funds with which to make the purchase.

This piece of property, as stated, was of the value of at least $25,000, but had an incumbrance on it of $4,000, and it was sold to O'Connor, subject to this incumbrance, for $15,000 cash, or at a sacrifice to Mrs. Dillon of at least $5,000 or $6,000. An assignment of the note and trust deed was taken by the respondent Savings Bank to itself, for which it allowed and paid Mrs. Dillon the sum of but $7,500 in cash—the amount of the note and interest being, as stated at the time, $8,200, and fully secured by property far in excess of that value. The proceeds of these sales, with the cash she then had in bank was by Mrs. Dillon at once turned into negotiable certificates of deposit issued to her by the two respondent banks; several, in varying sums, amounting to $22,000 by the First National, and one, for $7,500, by the Savings Bank. All of these transactions were accomplished by Mrs. Dillon with the active aid of the respondents on and prior to the 6th of October, or within three days from the rendition of the judgment, and she and her husband a day or so thereafter left Modesto leaving no knowledge of their destination with any one but her bankers and her attorneys.

These facts coming to the knowledge of the plaintiffs, they, being unable to locate Mrs. Dillon's whereabouts, brought the matter to the attention of the court, which at once vacated the order staying proceedings on the judgment, and an execution was on October 11th issued and placed in the hands of the marshal; but the marshal was unable to find any property of Mrs. Dillon upon which to levy, other than the dwelling upon which a homestead had been declared and a remnant of some $500 still on deposit in the two banks, and apparently overlooked, which was represented by their officers as all the money or property of Mrs. Dillon in their keeping or of which they had any knowledge. Thereupon this proceeding was instituted; the prayer being that the respondents be adjudged guilty of contempt, and that they be punished by being required to pay plaintiffs compensatory damages in the amount of the judgment.

As to the facts thus far stated, they stand in the main established without substantial conflict. The respondents in fact do not deny, in their sworn answers or in their evidence, that they aided Mrs. Dillon in the disposition of her property substantially in the manner stated; but their defense on the facts is in effect that what they did was without knowledge of her purpose in thus disposing of her property, that they treated the transactions as ordinary business dealings with a patron who had a perfect right to dispose of the property, and in which they had a perfect right to aid her, and that there was no intent on their part to aid her to defeat or obstruct the satisfaction of the judgment or the process of the court.

[1, 2] As to the legal aspects of what was done, they will be discussed later. As to the knowledge and intent of the respondents in what they did, it is sufficient to say that, as to the two respondents, Peck and Swan, I regard their claim of innocence of the purpose of Mrs. Dillon, as well as their own lack of wrongful purpose in the transactions to which they lent their aid and connivance, as wholly at variance, not

only with the obvious, but, indeed, with the only reasonable, deductions to be drawn from the circumstances, and as to the two banks, they, of course, are chargeable with the same knowledge, purpose and intent as their officers through whom alone they could act. The two individual respondents swear very positively, it is true, in support of their alleged lack of wrongful intent; but their evidence is shifting, unsatisfactory and evasive, and the court is unable to give it credence as against the overwhelming effect of the circumstances appearing in evidence. They both, for instance, positively denied having any knowledge of the judgment against Mrs. Dillon before October 5th, which was subsequent to the date the conspiracy is alleged to have been initiated, and claimed that they did not learn of the order staying execution until later. But the circumstances tend to wholly refute both these claims. One of them, Swan, was a witness for the defendants at the trial, apparently took an active interest, and remained in attendance admittedly until after the evidence was closed. He claims to have left for home before the verdict was rendered, but, however this may be, the result of the trial was known in Modesto the same evening—was, in fact, published in the local evening paper of the 3d and again in the morning paper of the 4th, and Modesto, being a town of but 12,000, was generally known to all its inhabitants; Mrs. Dillon being an old and prominent resident, and the case having excited general interest. O'Connor, the corespondent, asked when he first heard of the judgment, testified:

"I think on the same day it was rendered. I think it was in the Modesto Evening News the same day. I think it was about the 3d of October."

And, further:

"Well, I knew about this judgment, it was in the papers that she had a judgment against her for $32,000. I read it in the papers. I knew that the same as all the rest of us knew it."

Moreover, the attorney who tried the case for Mrs. Dillon was the regular attorney for the respondent banks and lived in Modesto. Under these circumstances it is idle to ask a reasonable person to believe that neither of these prominent, active, business men, living in this small community, had heard of this judgment prior to October 5th—a judgment against an old and valued patron. And what either of them knew the other undoubtedly knew. The two banks were interrelated and connected in business, occupying the same premises; Peck being president of the National Bank and vice president of the other, and Swan being president of the Savings Bank and vice president of the Commercial Bank, while the subordinates performed service for both interchangeably if occasion required. Of course, it would not necessarily negative the truth of the charge, had they not known of the judgment before the 5th of October as the acts charged to have been done in pursuance of the alleged conspiracy were done on the 6th; but the respondents evidently believed or had been advised otherwise, and shaped their evidence accordingly.

They both testified further, in their defense, that they regarded the

transactions in which they participated with Mrs. Dillon as simply "ordinary, every day" matters in which they had a perfect right to lend her their aid; that they had no knowledge or reason to believe that there was any purpose on her part to dispose of her property to avoid the judgment against her, and that they had no intent to aid her in any such purpose or to interfere with the execution of the judgment; and this attitude is strongly urged upon the court by their counsel as the reasonable construction to be put upon their acts. But, as stated, the evidence does not warrant this view. To the contrary, it very clearly shows that, not only were the transfers made by Mrs. Dillon not in any proper sense "ordinary" or "usual" business transactions, but moreover, that they were conducted in her behalf by these respondents in a very unusual manner—in a manner, indeed, to indicate very clearly that they knew perfectly well that Mrs. Dillon was engaged in hot haste in fixing her property to avoid the execution of this judgment and that they did everything they could to aid her to accomplish that purpose. A brief statement of some of the more salient circumstances will demonstrate the correctness of this view.

In the first place, it is idle to call it an ordinary or usual business transaction for a woman of Mrs. Dillon's age (upwards of 70 years), situated as she was in a comfortable home and surroundings where she had lived for years, in easy financial circumstances, with thousands of dollars in bank in ready money, and her other property invested to produce a good income, to suddenly and with no apparent necessity determine to dispose of all her tangible property, at a large sacrifice, simply to enable her to turn it into cash to be invested in a manner to produce a much less rate of income and then to leave her old home for strange surroundings. And the evidence shows that these respondents were perfectly familiar with Mrs. Dillon's financial circumstances, having known and dealt with her for years, and could therefore fully appreciate the utter lack, to say the least, of good business judgment in what she proposed to do; but there is not a word in their testimony that they asked a question as to her purpose or reasons for her extraordinary course, or expressed the slightest surprise or dissent, or gave her a word of admonition against her proposed folly, but proceeded with alacrity and the most apparent readiness to carry out her request—because, as they say, they regarded it as a perfectly "reasonable" proposition.

And how was the disposition of the property accomplished? On being advised by Mrs. Dillon that she wished to dispose of her property, Mr. Peck at once called up O'Connor on the telephone, a man with whom respondents were on intimate business relations, and with whom one of them was at the time interested in a real estate deal, and informed him that Mrs. Dillon wished to dispose of her land, and he thought would sell cheap, and that she was in a hurry to dispose of it. O'Connor had already heard of the judgment and knew Mrs. Dillon was "in trouble." He goes immediately to the bank and finds Mrs. Dillon there, but he does not talk with her; he talks with Peck and Swan; they do the negotiating; they tell him the national bank will

275 F.—30

loan him the money with which to purchase the land—which it does without an indorser or a scrap of security; the price is agreed upon, and O'Connor never has a word with Mrs. Dillon until he passes her his check and receives her deed, the transaction being had entirely with Peck and Swan up to that time, and being rushed through the same afternoon on which the proposition was first made to O'Connor and within the brief period of two hours. This was on October 6th, and on the same day the savings bank took over the note and deed of trust for $7,500, issuing to Mrs. Dillon its time certificate of deposit in that sum at 4 per cent. interest in liquidation of the purchase price.

When O'Connor received her deed and gave his check for the land, he instructed Peck and Swan that they were not to cash the check for Mrs. Dillon until he had had the title examined and should notify them that it was all right; that, should the title prove bad, the deal would be off. But it appears that, instead of observing this instruction, respondents on the same day, October 6th, passed the check to Mrs. Dillon's credit in the First National Bank, and the latter issued to her therefor three six-months' certificates of deposit for $5,000, bearing 4 per cent. interest. On the same day the bank split up a like certificate for $7,000, previously issued to her, and in its place issued two demand certificates for $500 each and a time certificate for the sum of $6,000. Immediately after these transactions, as before stated, Mrs. Dillon disappeared from Modesto, leaving no trace, and her whereabouts were not discovered by plaintiffs until some months thereafter. Before she left the respondents delivered to her the $6,000 and the two $500 certificates of deposit last mentioned, but the three $5,000 certificates, and the one issued by the savings bank for $7,500 were left in the keeping of the two banks—for what reason does not appear.

There were, moreover, several very unusual and significant things done by these two respondents and their subordinates in the banks, wholly inconsistent with their claim that they had no knowledge of the purpose of Mrs. Dillon in concealing her property and showing the readiness and alacrity with which they lent their aid to carry out her wishes and instructions. Within a couple of days after Mrs. Dillon left Modesto—about October 10th—she called up on the telephone and asked that respondents send her a demand certificate for $3,000 out of the $7,500 certificate issued by the savings bank. Her message was taken by Mr. Stoddard, who was vice president of the National Bank. He took the $7,500 certificate, which had not been indorsed by Mrs. Dillon, indorsed it in her name, issued one for $3,000, and mailed it as requested, then issued another to Mrs. Dillon for the balance of $4,500 and placed it with her other certificates. When asked where he got authority to indorse the $7,500 certificate in Mrs. Dillon's name, Mr. Stoddard first said he considered the request on the telephone sufficient, but later said he asked Mr. Peck, who told him it was all right.

On the afternoon of October 10th the attorney for plaintiffs, accompanied by the attorney for Mrs. Dillon, came to the court's chambers, and the former advised the judge that he was informed Mrs. Dillon was disposing of her property, and, he feared, to avoid execution, and

asked to have the stay of execution vacated. He was directed to come into court the next morning and make a showing, and if the fact was as he stated the stay order would be set aside. On the following morning, October 11th, the stay order was vacated and an execution was at once issued and placed in the hands of the marshal. But early on the morning of the 11th, about 8 :30 or 9 o'clock, the court's purpose having apparently got abroad, the respondents were requested by telephone to send all the certificates left in their possession to Mrs. Dillon's address in San Francisco at once. The call was received by Mr. Stoddard. It purported to come from San Francisco, but Mr. Stoddard could not say from whom; it stated that the party speaking was telephoning on behalf of Mrs. Dillon, who was not well; the name of the sender of the message was neither asked nor given, but the certificates, consisting of the three for $5,000 each and the one for $4,500 ($19,500 in all), were at once, and without further inquiry by the bank, mailed to Mrs. Dillon's address in San Francisco. This was on Saturday and on the following Monday, when the marshal and plaintiffs' attorney called on respondents and told them they had come to levy execution on Mrs. Dillon's property, they were promptly informed by Swan that he thought they had "come a little late"; and, asked what he meant by that, he said "that so far as the bank was concerned the assets of Mrs. Dillon had been withdrawn," and that "so far as he knew there was nothing left there." Subsequently, in their return to the garnishment served by the marshal, they first made return of but $55.59 remaining on deposit as belonging to Mrs. Dillon, and that they had "no other property of any kind or character" belonging to her. Later they notified the marshal that they had "found" $430.14 more, which had been in the savings bank, but overlooked. The several certificates outstanding in favor of Mrs. Dillon were not set out in their return—as they claimed, on the advice of their attorney. They denied any knowledge whatsoever of the whereabouts of Mrs. Dillon, although they had been in communication with her by telephone within two days and knew her address; they denied ever consulting with the attorney for the banks about the judgment against Mrs. Dillon, or as to the propriety of any of the transactions concerning her property; and the equivocating and evasive character of their testimony throughout is well illustrated by that of Mr. Peck on this subject. He was asked by counsel for plaintiffs:

"Did you consult Mr. Hawkins concerning any of these transactions? A. No, sir. Q. Not at all? A. No, sir."

The court then asked him:

"Did you never discuss this transaction during any of its history or in any of its phases with the attorney for the bank? A. Which transaction? Q. What we are investigating here. A. I never discussed it with Mr. Hawkins, only in a casual way, visiting. I never discussed it professionally at all. Q. That is putting your characterization on it when you say only in a casual way. What do you mean by that? What was said between you? A. Mr. Hawkins was present at the time we met down in Mr. Ehrman's office, and we just discussed the matter in a general way. Q. Would you tell us what was said, and leave out the characterization as to whether it was in a general

way or a casual way? I want to get at the facts, not somebody's construction of them, because I have to construe these facts."

But the witness never did state anything of a specific character said between him and the attorney, other than that the latter advised them not to include the certificates of deposit in their return. The same witness, being examined about issuing certificates to Mrs. Dillon on the O'Connor note on October 6th, after being instructed by O'Connor to withhold cashing it until the title had been passed on—which was not until October 9th—was asked by the court:

"Q. How did that come about? A. You mean, how were they dated before the 9th? Q. How did they come to be issued at a time when she did not have the funds there? A. The check of Mr. O'Connor was dated the 6th. If we had waited until the 9th to date them, we would be simply beating her out of three days' interest on the transaction. Q. You are not in the habit of drawing certificates of deposit in favor of one who has not the funds in your bank, are you? A. No; not in an ordinary transaction perhaps, but this was a transaction where she was putting the money all on interest. Q. How did you know that? A. Because she had us issue certificates of deposit. She said, 'put that on interest right now.' "

That testimony was given on December 1st. On December 4th the witness, being again asked about the same transaction, gave the reason for issuing the certificate on October 6th that escrow transactions were "always handled that way." It is quite obvious, I think, that the real reason for issuing these certificates so precipitately, and at a time when they did not know if the sale would go through, was to have the security in such a form that, in case of emergency, would enable them to be assigned or passed to others, so they could not be readily reached—as was subsequently done.

I have stated the facts and circumstances thus at length, in view of the strenuous denial by the respondents of any knowledge of a wrongful purpose on the part of Mrs. Dillon, or any intent on their part to aid her in defeating the satisfaction of the judgment in question; but I have not the slightest hesitation upon these facts in finding, and that beyond any reasonable doubt, that these respondents knew perfectly, not only about the judgment and its stay, but of Mrs. Dillon's purpose in the transaction, and with that knowledge deliberately aided her, so far as lay in their power, to accomplish it.

[3] As to the respondent O'Connor the case presents a somewhat different aspect. What he did in the matter is perhaps what most any man engaged in his business would have done, without inquiring too closely into the circumstances. He, like his corespondents, denied any guilty knowledge or purpose; but there are some phases of the evidence as to him which strongly indicate that he participated with a pretty shrewd idea of what the real purpose was on the part of Mrs. Dillon and his corespondents in the transaction, but was willing to "take a chance." One of the things that casts grave doubt in my mind of O'Connor's perfect innocence of such purpose was his extreme desire to shield his corespondents by denying on the stand significant things previously stated to the marshal and the attorney for the plaintiffs. He told the marshal, for instance, that Peck had called him

on the telephone and told him of Mrs. Dillon's urgent desire to dispose of her property, and that he went to the bank in response to such call. On the stand he denied this, and said, in effect, he "happened in the bank" on the occasion, and his purchase of the land was the result of his own inquiry whether it was for sale—prompted by his knowing that Mrs. Dillon was "in trouble." I prefer to believe the version given by him when questioned by plaintiffs' attorney and the deputy marshal, Mr. Burnham. There are some other things of a like kind which tend to cast doubt on O'Connor's perfect innocence; but, without further discussion of the evidence, it is enough to say that it does not satisfy me beyond a reasonable doubt of his having sufficient knowledge at the time he made the purchase of the real purpose of the others concerned to render him culpable. If the finding rested upon a preponderance of the evidence the case might be different; but within the principles stated by the Court of Appeals of this circuit in Hanley v. Pac. Live Stock Company, 234 Fed. 522, I do not feel justified in holding him.

The question still remains as to whether the acts done by the other respondents, as above stated, constitute in law a contempt of this court. Respondents contend, with apparent confidence, that the facts stated afford no competent basis in law for a judgment in contempt against them; that the judgment against Mrs. Dillon was, at the time in question, a naked common-law judgment, upon which execution had not issued, and which cast no lien or hold of any character upon her property, real or personal; that such a judgment in no way restrained or affected her right to transfer or dispose of her property in such manner as she might see fit; and that what she was at liberty to do the respondents had a perfect right to aid or assist her in doing, without rendering themselves liable in any way to the plaintiffs. This contention involves several propositions more or less distinct which should properly be discussed separately. Whether the judgment constituted a lien on the property dealt with is a question much mooted, and of conceded importance in its effect upon the acts of the respondents, and it should not be confused with a discussion of the rights of the parties under the judgment considered apart from such effect. The question may therefore be laid on one side for later consideration.

[4] That an ordinary judgment at law for damages, casting no lien on the property of the judgment debtor, presents no legal obstacle to the alienation or incumbering of the property by the debtor, may, as an abstraction, be conceded; but even there the disposition in order to protect the judgment debtor must be for a legitimate end, for a valuable consideration, and not for the fraudulent purpose of evading the judgment. And if the disposition be for the purpose of defeating the rights of the judgment creditor and is knowingly participated in by others the latter are liable to the creditor for the damages caused him by their interference. "The right of a judgment creditor to proceed by action against those who * * * interfere with the goods of his debtor, so as to prevent a levy or sale by the sheriff to satisfy his judgment, is well recognized at common law." Findlay v. Mc-

Allister, 113 U. S. 104, 5 Sup. Ct. 401, 28 L. Ed. 930. And the interference may under some circumstances involve a contempt. See authorities cited in that case.

[5-8] But we are not here dealing with the effect of the judgment, standing alone. The contention of respondents ignores a factor which puts the case in a very different aspect as to the acts of the respondents from that of a mere naked judgment. As we have seen, the defendants upon the rendition of the judgment asked of the court and were granted a stay of execution against them, and at the time of the acts complained of this stay order was still in force and was within the knowledge of the respondents. This fact introduces an element into the case which may not be ignored. This stay order was not a matter of right in the defendants, but was purely discretionary with the court and intended only to maintain the rights of the parties in statu quo pending steps for a new trial or appeal as they might be advised. Both parties were charged as matter of law with a knowledge of this purpose, and that neither was rightfully at liberty during the existence of the order to take any steps intended to impair the rights of the other under the judgment; and these things were as plainly implied from this order as though written into it in express terms.

When, therefore, the respondents undertook to render this judgment nugatory and valueless by lending their aid to remove the only tangible property of the judgment debtor beyond the reach of process, they were as guilty of violating the court's order as though it had forbidden their acts in positive terms, and under well-established principles their acts constituted a contempt of the court. Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender. These courts, equally with those of the state, are possessed of ample power to protect the administration of justice from being thus hampered or interfered with. Nor is this power in any wise limited by section 268, Judicial Code (Comp. St. § 1245). That section "conferred no power not already granted, and imposed no limitations not already existing." Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186. The above principles will be found amply sustained in the leading cases on the subject. Ex parte Kellogg, 64 Cal. 343, 30 Pac. 1030; Wartman v. Wartman, Taney, 362, 29 Fed. Cas. 303; Merrimack Bank v. Clay Center, 219 U. S. 527, 31 Sup. Ct. 295, 55 L. Ed. 320; Clay v. Waters (C. C. A. 8th Circuit), 178 Fed. 385, 391, 101 C. C. A. 645, 21 Ann. Cas. 897; In re Mardenfeld, 256 Fed. 920; State ex rel. Morse v. District Court, 29 Mont. 230, 74 Pac. 412.

Ex parte Kellogg is aptly analogous. There the party, on examination as to his property on supplemental proceedings and in anticipation of an order being made requiring him to turn certain personal property over to the sheriff, asked for a continuance, which the lower court found was to enable him to dispose of the property to a third party, thus rendering himself unable to comply with the anticipated

order when subsequently made. He was held guilty of contempt, and the Supreme Court, speaking through Judge Ross, held that this action was "but a bold attempt" to defeat the order subsequently made "and cause the plaintiffs' proceedings to be barren of result," and that he was properly punished for the contempt. This case will be found cited with approval in both Merrimack Bank v. Clay Center and Clay v. Waters.

In Merrimack Bank v. Clay Center, a bill to prevent removal of certain poles and wires from the streets was dismissed by the court below on demurrer, and an appeal to the Supreme Court was dismissed by the latter tribunal without opinion; an application for rehearing was filed, and during its pendency respondents proceeded to remove the poles. The Supreme Court pronounced them guilty of contempt in thus undertaking to interfere with their appellate jurisdiction before the controversy was finally determined, saying:

"That such conduct may be a violation of the injunction below affords no reason why it is not also a contempt of this court. Unless this be so, a reversal of the decree would be but a barren victory, since the very result would have been brought about by the lawless act of the defendants which it was the object of the suit to prevent."

So here the purpose of the stay order to maintain the status quo was negatived and its effect wholly defeated by the acts of the respondents.

In Wartman v. Wartman, heard by Chief Justice Taney on circuit, the question was whether a defendant who had parted with an alleged trust fund in his custody pending an application for an order requiring him to pay the money into court was thereby in contempt. His act was held to be in contempt of the authority of the court, "as a final decree would be idle and nugatory, if pending the litigation he should be held at liberty to put the fund beyond the reach of the process of the court."

In State ex rel. Morse v. District Court, a chief of police and his subordinates, having knowledge that a writ of habeas corpus had been issued for a prisoner in their custody, eluded the service of the writ until they had delivered the prisoner to the messenger of the Governor of another state under extradition process. They were held guilty of contempt of the court issuing the writ, and it was said:

"Although there was no technical, actual, personal service of the writ upon Morse prior to the removal of the prisoner from the county by the messenger to whom he was delivered by the police, it must have been apparent to the District Court, upon the hearing on contempt, as it is apparent to us, that all of the relators herein, having knowledge that the writ had been issued, used their utmost endeavors to avoid it. * * * It is impossible to conceive of a more flagrant act of contempt of court than the unlawful interference with such a writ."

See, also, United States v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319, Id., 214 U. S. 386, 29 Sup. Ct. 637, 53 L. Ed. 1041, as to the duty of the court, pending a stay of the execution of the judgment, to protect the rights of the parties against a violation of such stay.

[9, 10] But there is another ground for which it must be held that respondents' acts constituted a contempt. It was tacitly conceded by respondents in argument that, if the judgment constituted a lien on the real estate of Mrs. Dillon, it would put a very different aspect upon their acts; that is, if those acts were found to have been committed in the face of a judgment lien, with the purpose of trying to impair or evade it, it would undoubtedly constitute a contempt. And I think there can be no doubt of the correctness of this view under the authorities above cited. That the judgment did constitute such a lien, attaching from the date of its docketing, may, I think, be readily shown. The theory of the respondents is that, in order to constitute a lien, the judgment being rendered in a county other than that in which the defendants' real estate was situated, it was necessary for plaintiffs to comply with the provisions of the state statute prescribing the method of making the judgment a lien on real property of the judgment debtor situated in a county other than that wherein the judgment is rendered. That statute is found in section 674, Code of Civil Procedure, which, so far as here pertinent, provides:

"The transcript of the original docket of any judgment, * * * certified by the clerk, may be filed with the recorder of any other county, and from such filing the judgment becomes a lien upon all the real property of the judgment debtor not exempt from execution in such county," etc.

Let us see if plaintiffs were called upon to comply with this provision, or if it would have availed them anything had they done so. Prior to any action by Congress making express provision upon the subject, it had become the settled doctrine of the federal courts that judgments of those courts had the same effect precisely in their operation as a lien upon the property of the judgment debtor as the law of the state in which they were rendered, prescribed for judgments in the state courts, and that such lien extended to all counties within the limits of the territorial jurisdiction of the court; that is, to the limits of the state or district for which the court sat. This construction was deemed necessary to put the judgments of federal courts on a parity or plane of equality with those of the state courts in protecting the rights of suitors. The rule is thus stated in Metcalf v. Watertown, 153 U. S. 671–678, 14 Sup. Ct. 947, 950, 38 L. Ed. 861:

"In those states where the judgment or the execution of a state court creates a lien only within the county in which the judgment is entered, it has not been doubted that a similar proceeding in the Circuit Court of the United States would create a lien to the extent of its jurisdiction. This has been the practical construction of the power of the courts of the United States whether the lien was held to be created by the issuing of process or by express statute. Any other construction would materially affect, and in some degree subvert, the judicial power of the Union. It would place suitors in the state courts in a much better condition than in the federal courts."

And see Dartmouth Savings Bank v. Bates (C. C.) 44 Fed. 546; Rock Island National Bank v. Thompson, 173 Ill. 593, 50 N. E. 1089, 64 Am. St. Rep. 137; Seventeenth Street Land Co. v. Hustead, 263 Pa. 342, 106 Atl. 540; Cooke v. Avery, 147 U. S. 375, 13 Sup. Ct. 340, 37 L. Ed. 209; Massingill v. Downs, 7 How. 760, 12 L. Ed. 903; U. S. v. Humphreys, 3 Hughes, 201, 26 Fed. Cas. 430, No. 15,422; Cropsey v. Crandall, 2 Blatchf. 341, 6 Fed. Cas. 873, No. 3,418, where the history and reason of the doctrine is fully gone into.

This effect ascribed to judgments in United States courts led to some hardship through the loss of their lands by citizens unaware of the fact of the existence of liens from such judgments, not of record in the county where the land was situated, and this, with kindred considerations, led Congress to pass Act Aug. 1, 1888, c. 729, 25 Stat. L. 357 (Comp. St. §§ 1606, 1607). The applicable feature of that act is this:

"That judgments and decrees rendered in a Circuit or District Court of the United States within any state, shall be liens on property throughout such state in the same manner and to the same extent and under the same conditions only as if such judgments and decrees had been rendered by a court of general jurisdiction of such state: Provided, that whenever the laws of any state require a judgment or decree of a state court to be registered, recorded, docketed, indexed, or any other thing to be done, in a particular manner, or in a certain office or county or parish in the state of Louisiana, before a lien shall attach, this act shall be applicable therein whenever and only whenever the laws of such state shall authorize the judgments and decrees of the United States courts to be registered, recorded, docketed, indexed, or otherwise conformed to the rules and requirements relating to the judgments and decrees of the courts of the state."

It will be observed that under the terms of the proviso the act is to have effect only in those states wherein the state law has made provision by which the mode of casting liens by judgments and decrees of the federal courts shall be "conformed to the rules and requirements relating to the judgments and decrees of the courts of the state"; in other words, until the state shall have provided— which obviously Congress did not possess the power to do—for docketing, or filing abstracts of the judgments of federal courts in the local state or county offices in the same manner as provided for judgments of state courts, and giving them like effect, thus putting them upon an equality with the latter as a protection to suitors, the limitations of the act should not apply, but a judgment or decree of a federal court should continue to cast a lien coextensive with the territorial limits of the jurisdiction of the court rendering it. And such has been the construction of the act. See Dartmouth Savings Bank v. Bates, and other cases last above cited.

Has this state met the requirements of this act in a manner to put judgments of these courts on an equality in this respect with judgments of state courts? Until 1917 there was no legislation on the subject, but in that year the Legislature passed an act adding a new section to the Code of Civil Procedure, numbered 671a (St. 1917, p. 142), reading as follows:

"Transcripts of judgments and copies of judgments, rendered in the district or other courts, of the United States within the state of California, when certified by the clerk of said courts under the seal thereof, may be filed and recorded in the office of the county clerk of any county in this state, and when so filed the clerk shall immediately enter the same in the judgment docket in the same manner as judgments rendered in the superior court are entered and such transcripts of judgments and copies of judgments, when so certified, may be filed for record in the office of any county recorder of this state and when so filed for record the county recorder shall record and index the same in the same manner as transcripts of judgments and copies of judgments of the courts of this state are recorded and indexed; and from such recording the

judgment becomes a lien upon all the real property of the judgment debtor not exempt from execution in such county," etc.

It may be assumed that this provision was intended in good faith to meet the requirements of the above act of Congress by an endeavor to create similar provisions as to the mode of acquiring judgment liens under judgments of the federal courts as those existing as to judgments of the state courts; but it will be seen at a glance that, if such was the purpose, it has signally failed in some very material respects to accomplish it. Quite evidently the section has been hastily, if not carelessly, drawn, and apparently without the draftsman having before him the Code provisions applying to judgments of the state courts, since it departs from the latter in several matters of substance. In the first place, one important feature of the Code provisions is wholly omitted. Under the state law judgments of its courts operate as a lien on the real estate of the judgment debtor in the county where rendered instanter upon its being docketed (Code Civ. Proc. § 671), nothing more being required of the judgment creditor; it being only to create a lien upon property in another county that a transcript of the docket must be there filed.

It will be observed that no such provision is embraced in section 671a, but, to the contrary, that section is so drawn as evidently to contemplate that the judgment of a federal court is not intended or to be permitted to operate as a lien, even in the county of its rendition, until a transcript or copy of the judgment has been first filed and recorded in the office of the county clerk and then filed with the recorder and by the latter duly "recorded and indexed." This omission alone would work a great disadvantage and embarrassment to a judgment creditor in a federal court.

In the next place, the provision for making a judgment of a federal court a lien in a county other than that where rendered is markedly different and more onerous than that provided for state judgments. As to the latter, the requirement is simply that "the transcript of the original docket  *  *  *  may be *filed* with the *recorder* of any other county, and *from such filing* the judgment becomes a lien" in such county; nothing being said about recording (Code Civ. Proc. § 674), while as to judgments of federal courts the requirement is that "transcripts of judgments and copies of judgments  *  *  *  may be *filed and recorded* in the office of the *county clerk* of any county," whereupon the clerk shall first enter it in his docket in like manner as judgments of the superior courts "and such transcripts of judgments and copies of judgments, when so certified may be filed for record in the office of any county recorder of this state and when so filed for record the county recorder shall *record and index* the same  *  *  * and *from such recording* the judgment becomes a lien," and only then. It will be readily seen that, not only is the judgment creditor under a federal judgment put to great circumlocution and necessarily greater expense than one holding a judgment of a state court, but that in the frequently important matter of time in getting his judgment to a point where it would operate as a lien the former would be hopelessly outdistanced by the latter.

The judgment creditor from the state court has his lien in the county where the judgment is rendered immediately the judgment is *docketed* by the clerk, without more; the judgment creditor from the federal court must, even in the county of its rendition, file a transcript or copy (possibly both) of his judgment first with the county clerk and then with the recorder, and wait until it is there *indexed and recorded*, before his lien attaches. And in securing his lien on property in another county the holder of the state judgment merely *files* his transcript with the *recorder* and at once his lien attaches; whereas the suitor in the federal court must go through the apparently useless process of first filing *and recording* his documents with the county clerk and then with the recorder, and again await the recording and indexing by the latter before the lien of his judgment attaches. Moreover, there is a serious question, arising from the loose and ambiguous language of the section, whether the suitor seeking to act under it would not in each instance be required to file and record with each clerk and recorder both a transcript and copy of the judgment. It will be observed that its language throughout is "transcripts of judgments *and* copies of judgments" that are to be filed and recorded; the terms being used conjunctively. It may possibly be that "and" should be construed as "or"; but, however this may be, I am satisfied that the legislation, whether from inadvertence or otherwise, does not, for the reasons stated, afford that degree of "conformity" which the act of Congress contemplates as essential to bring it within the latter and put judgments of federal courts on an equality with those of the state; that consequently the act of Congress does not take effect in this state, but the judgments of these courts must be regarded as constituting therein liens on the real estate of judgment debtors throughout the extent of their territorial jurisdiction. (Italics in above quotations volunteered.)

[11] As a result of these considerations, the acts of the respondents must be held to constitute a contempt of the process of the court, and, having in mind all the circumstances, I regard it as a more than ordinarily aggravated one. It remains only to consider the punishment to be imposed. Pending this proceeding, which was much delayed and interrupted through the inability to find Mrs. Dillon, the court, upon motion for new trial, reduced the amount of the judgment recovered to $28,000, and this judgment was subsequently affirmed on writ of error. After great annoyance and expense to plaintiff in the employment of officers in the search, they eventually succeeded, after the lapse of many weeks, in ascertaining the whereabouts of Mrs. Dillon, where she was living under an assumed name, and she was finally brought before the court on supplemental proceedings to answer as to her property, and by dint of much effort and difficulty a considerable part of the funds she had concealed and carried away was finally uncovered; she had cashed most of her certificates of deposit issued by the respondent banks, reinvested the larger part in like certificates, issued to her under assumed names in stranger banks, and spent, or otherwise disposed of, the balance, so that it could not be reached. As a result of her examination the marshal was enabled to seize and ap-

ply to the judgment enough to satisfy all but $3,367.11 by September 24, 1920. No further available property has been discovered, and that balance, with interest, now remains unpaid on the judgment.

While plaintiffs might possibly be able to upset the homestead or the sale of the other property, I do not think they should be put to further expense, or subjected to the annoyance and hazards of any such effort, in order to realize the balance of their judgment. The respondents, by their aid and connivance, made it possible for Mrs. Dillon to carry away funds much in excess of the sum sufficient to satisfy the judgment in full, and it would seem but bare justice that they should be called upon to make plaintiffs good in the amount they have lost through their interference. The respondents and Mrs. Dillon are in their unlawful acts joint tort-feasors, and it is not a case where plaintiffs should first be required to exhaust their remedy against the latter. Accordingly the plaintiffs may prepare findings to accord with the facts as above outlined, and upon such findings, when signed and filed, the clerk will enter judgment adjudging the two banks and the respondents Peck and Swan jointly guilty of a contempt of the court; that they be fined and adjudged to pay to the plaintiffs, as compensatory damages, such sum as will be found to cover the balance remaining due and unpaid on the judgment, with interest thereon from September 24, 1920, together with plaintiffs' costs, both of this proceeding and the proceedings supplemental to execution, and, in addition, an attorney's fee in the sum of $750; that the judgment direct that, if the amount thereof be not paid within 15 days from notice of its entry, plaintiffs may have execution thereon against the property of the respondents named, and each of them.

As to the respondent O'Connor, an order may be entered, for the reasons stated, that the rule be discharged, and he dismissed.